## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

|  |  |  |
|---|---|---|
| **RAMSES ROUTIER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **December 29, 2017** |
| **v.** | ) | |
| | ) | **Case No.: 17-2833** |
| **WILBUR ROSS, SECRETARY,** | ) | |
| **DEPARTMENT OF COMMERCE,** | ) | **Jury Trial Demanded** |
| | ) | |
| **Defendant.** | ) | |

_____)

## COMPLAINT

Plaintiff, Ramses Routier ("Mr. Routier" or "Plaintiff"), by and through undersigned counsel, herein states his complaint of discrimination and retaliation against Wilbur Ross, Secretary of the Department of Commerce. Plaintiff states the following in support of his complaint to the best of his knowledge, information and belief, formed after an inquiry reasonable under the circumstances. On information and belief, Plaintiff states the following.

### PRELIMINARY STATEMENT

This civil action is brought by Mr. Routier to seek redress for discriminatory and retaliatory actions, taken against him by the Defendant, Wilbur Ross, Secretary, United States Department of Commerce ("Agency" or "Commerce Department") in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*, and the Civil Rights Act of 1991, 42 U.S.C. § 1981 for relief from racial and national origin discrimination and retaliation for engaging in EEO protected activity. This civil action is also brought pursuant to the Age Discrimination in Employment Act of 1967 (ADEA).

1

## A.  DESCRIPTION OF THE PARTIES

1.     Plaintiff Ramses Routier is a Haitian-American male currently 62 years of age who was over the age of 40 at all times relevant to this complaint. He complained of discrimination in 2014 and filed an EEO complaint on November 25, 2014.  Mr. Routier has two graduate degrees in electronics engineering and is a published author.  R. Routier and R. Burkholder, *Asymptotic Techniques in Naval Ship Design*, Annual Review of Progress in Applied Computational Electromagnetics; 1; 243-249 (1998),

https://www.tib.eu/de/suchen/id/BLCP%3ACN030015680/Asymptotic-Techniques-in-Naval-Ship-Design/

2.     Defendant Wilbur Ross is the head of the U.S. Department of Commerce, an Agency of the Executive Branch of the United States Government.  He is sued in his official capacity only, and on behalf of his predecessors, successors, agents, and employees.

## B.  JURISDICTION AND VENUE

3.     This Court has jurisdiction over Mr. Routier's claims of discrimination, harassment and retaliation that precede his removal from Federal service under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-16, *et seq*.

4.     This Court has jurisdiction over Mr. Routier's removal from Federal service pursuant to the Civil Service Reform Act of 1978 (CSRA), 5 U.S.C. § 1101 *et seq*., and 5 U.S.C. § 7703(b)(2), as amended.  Under 5 U.S.C. § 7703(b)(2), an Plaintiff shall appeal an MSPB Board decision involving alleged discrimination offensive to enumerated anti-discrimination statutes described at 5 U.S.C. § 7702(a)(1), *i.e.*, Section 717 of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-16. *et seq*.; to a Federal district court.  *Kloeckner v. Solis*, 133 S. Ct. 596, 604 (2012).

5.      Venue lies in this Court because Defendant is located in the District of Columbia, where it employed Plaintiff, and where discriminatory and retaliatory actions took place.  42 U.S.C. §2000e-5.

C.      **FACTS**

6.      The United States Department of Commerce is a part of the Executive Branch of the Federal Government and is comprised of many bureaus and activities, including the National Telecommunications and Information Administration (NTIA).

7.      NTIA's programs and policymaking focus largely on expanding broadband Internet access and adoption in America, expanding the use of spectrum by all users, and ensuring that the Internet remains an engine for continued innovation and economic growth.  *See* U.S. Department of Commerce, About NTIA, http://www.nita.gov/about (visited November 18, 2016).

8.      Within NTIA is the Office of Spectrum Management (OSM).  *See* NTIA, Office of Spectrum Management, http://www.ntia.doc.gov/office/OSM (visited February 18, 2016). OSM is "dedicated to protecting the vital Federal government operations that use spectrum while also supporting the growth of commercial wireless broadband and technologies in America."

9.       Within OSM is the Systems Review Branch (SRB).  SRB assists the Executive Branch in the development and implementation of domestic and international policy by performing studies and analyses associated with the federal government's use of the radio spectrum.  Specifically, SRB examines existing and planned equipment to determine if the use of the spectrum will be efficient and effective, whether the potential exists for sharing federal and non-federal services and systems, and whether the effects of planned and proposed national

and international allocations may alter the ability of federal agencies to complete their mandated missions.

10.     During the period relevant to this Appeal, Plaintiff served as an Electronics Engineer, GS-0855-13, with the Agency's National Telecommunications and Information Administration (NTIA), Office of Spectrum Management (OSM), Spectrum Services Division (SSD).

11.     During the period relevant to this Appeal, Binyam Tadesse (Ethiopian-American, black, EEO activity unknown, over the age of 40) Chief, SRB, served as Plaintiff's first-level supervisor.

12.     During the period relevant to this Appeal, Dr. Darlene Drazenovich (American-born, Caucasian, EEO activity unknown, over the age of 40) Chief, Spectrum Services Division, OSM, served as Plaintiff's second-level supervisor.

13.     As an Electronics Engineer, GS-0855-13, Plaintiff was responsible for performing preliminary assessments of major federal radio communications systems to support policy decisions and the development of procedures for efficient spectrum utilization.

14.     In his position, Plaintiff was charged with providing advice and guidance in resolving technical and policy problems and developing new techniques and approaches. Finally, Plaintiff was responsible for providing electronics engineering expertise to the Spectrum Services Division.

15.     Finally, Plaintiff was responsible for providing electronics engineering expertise to the Spectrum Services Division.

16.     In or around 2012, Plaintiff visited Drazenovich at her office to inquire about his chances for success in obtaining a promotion to GS-14.

17.     Drazenovich slammed the door in Plaintiff's face.

16.     On another occasion, Tadesse derisively asked Plaintiff whether Plaintiff, a born-again Christian, engaged in the practice of voodoo.

17.     Voodoo is a syncretic religion practiced chiefly in Haiti and the Haitian diaspora described as Satanic and with other negative connotations.

18.     Tadesse knew that the Plaintiff was born and raised in Haiti.

19.     On another occasion, Drazenovich and Tadesse referred to Plaintiff and many of Tadesse's electronic engineer employees as old and indicated that they needed "fresh blood" in their office.

**A.      Plaintiff's Performance Prior to Issuance of the Performance Improvement Plan**

20.     From year to year, Plaintiff's performance plan typically consisted of three Critical Elements (CE):  CE 1, Customer Service; CE 2, Spectrum Requirements; and CE 3, Spectrum Management Improvements.[1]

21.     In Fiscal Year (FY) 2012 and FY 2013, Binyam Tadesse gave Plaintiff an overall performance rating of "3."  Prior supervisors rated Plaintiff as a "4."

22.     Hien Q. Ly is an Asian, Vietnamese-American under the age of 40.

23.     In FY 2013, Tadesse gave Hien Ly, then a GS-0855-12 Electronics Engineer, a rating of "5" in the critical area of Customer Service, and a "4" in the critical area of Spectrum Requirements.

24.     In July 2013, Tadesse told Plaintiff that he was frustrated with reviewing Plaintiff's work because of the amount of time it takes to review.

---

[1] While the CE number assigned to Spectrum Requirements changed over the years, its weight of 60% did not.

25.     Tadesse would later testify under oath that he did not find reviewing and correcting Hien Ly's work frustrating.

26.     In December 2013, Tadesse met with Plaintiff to discuss yearly performance. During that time, Tadesse told Plaintiff that he was not ready to get promoted to the GS-14 level and claimed that his work performance was not good enough.

**B.   Hien Ly's 2014 performance on the Preliminary Assessment and Draft Certification for No. SPS-19819/2**

27.     On or about May 22, 2014, Hien Ly submitted a draft of Preliminary Assessment No. SPS-19819/2 to Tadesse for review.

28.     Ly's draft exhibited seven instances of incorrect information and/or substantive errors.

29.     According to Tadesse's comments, Ly redundantly referred to band 4940-4950 MHz as "non-allocated band," Ly included the incorrect information "However, it is not feasible to conduct such nonconforming operations on a non-interference basis. Details of EMC analysis should be provided," Ly omitted critical information ultimately inserted by Tadesse: "However, the Air Force did not adequately justify the need for an additional 10 MHz band while the entire 540 MHz band is allocated for mobile operations on a primary basis in the 4400-4900 MHz to support the operations," referred to "Federal Usage" under the 4940-4990 MHz range as "Federal Aeronautical Mobile services" in the Allocation Conformance section under "Findings," Ly included more incorrect information that Tadesse deleted from the "Remarks" column of the Allocation Conformance section, Ly included more incorrect information that Tadesse deleted from the Radiation Hazard table "Findings" column, Ly included the incorrect frequency, Antenna gain and Average power in the Radiation Hazard table in the "Remarks" column),

Tadesse deleted almost the entire content of the Applicable Policy and EMC sections of the table, and Tadesse deleted Endnote 2 in its entirety.

30. In the related Certificate of Spectrum Support for No. SPS-19819/2, Ly included three pieces of incorrect information: Ly incorrectly listed frequency range as 5350-5850 instead of 4400-4940, Ly included inconclusive station classes, and he made the incorrect recommendation that "the Air Force must coordinate with the FAA."

31. On July 23, 2014, Tadesse came to Plaintiff's cubicle and told him that he was tired of seeing him making errors in his preliminary assessment. Tadesse then invited Plaintiff into his office and then showed him a typographical error from April 2014, an error that Plaintiff had corrected soon after an April 2014 meeting. During the July 23, 2014 meeting, Tadesse told him that he planned on his using the "performance counseling" to fire him.

32. Tadesse also commented that he would "let [him] go" as an employee.

33. On July 24, 2014, the Plaintiff filed a report of hostile work environment with the Agency.

34. On August 14, 2014, Tadesse issued him a "Performance Counseling" memorandum notifying him that his performance was "of concern."

35. In this memorandum, Tadesse advised Plaintiff of his concerns with his performance in CE 2, Spectrum Requirements.

36. Tadesse noted that in support of this CE, Plaintiff was responsible for preparing preliminary assessments of proposed federal radio communications.

37. Tadesse alleged that Plaintiff's work products have required extensive editing and review resulting in delays and additional work for SRB.

38. Tadesse cited, as examples, several preliminary assessments that he claimed

7

contained irrelevant information, did not contain necessary information, or had numerous grammatical errors.

39. Tadesse opined that it is important for these assessments to be accurate and thorough, as they are provided to the Spectrum Planning Subcommittee. Tadesse also told Plaintiff of his expectations for his work, stating that he is expected to review his work before submission for grammar and spelling, use proper formatting, and use a checklist (for completion of his work product) Tadesse provided.

40. Finally, Tadesse promised that, to improve Plaintiff's performance, he would meet with him weekly to provide guidance and answer any questions he may have; authorized Plaintiff one hour a week to review the Manual of Regulations and Procedures for Federal Radio Frequency Management; and authorized Plaintiff to take three courses online at the Commerce Learning Center website.

41. On October 2, 2014, Tadesse "harshly and loudly inquired" about Plaintiff's whereabouts when Plaintiff left the office to attend the Department's National Disability Awareness Month program; Plaintiff's son suffers from multiple sclerosis.

### C. **Plaintiff's and Ly's 2014 Performance Evaluations**

42. On October 4, 2014, Plaintiff received his FY 2014 performance evaluation. Tadesse issued Plaintiff a rating of 2 in CE 1, Customer Service, and a rating of 2 for CE 2, Spectrum Requirements, and a rating of 2 for CE 3, Spectrum Management Improvements, resulting in an overall "Level 2 or Marginal" rating.

43. A written justification is required for any element rated below Level 3.

44. Tadesse claimed that Plaintiff lacked the ability to identify the applicable technical and/or policy guidelines that he should be including in his assessments. Tadesse also

explained that Plaintiff "lacks knowledge of basic formatting and editing in Word processing skills," which places a burden on him (Tadesse) to edit Plaintiff's finished work product.

45.     On or about October 10, 2014, Hien Ly received his FY 2014 performance evaluation.  Tadesse issued Mr. Ly a rating of 5 in CE 1, Customer Service, a rating of 5 in CE 2, and a rating of 4 for Spectrum Management Improvements, resulting in an overall "Level 5 or Outstanding" rating.

46.     The rating made no mention of Ly's performance on Preliminary Assessment No. SPS-19819/2 or Certificate of Spectrum Support No. SPS-19819/2.

47.     On November 12, 2014, Plaintiff initiated EEO contact.

48.     On November 18, 2014, Tadesse issued Plaintiff his performance plan for Fiscal Year (FY) 2015.   In this signed FY 2015 performance plan, Spectrum Requirements was identified as CE 5.[2]  The major activities, criteria for evaluation, and weight remained the same between FY 2014 and 2015.

49.     On November 25, 2014, Plaintiff filed a formal EEO complaint with the Agency.

50.     Tadesse deliberately excluded Plaintiff's name from recipients of the Systems Review Branch Group Gold Medal Award to be presented his colleagues in January 2015.

51.     On April 24, 2015, an EEO investigator contacted Plaintiff and notified him that she would be arranging a telephone interview at the end of the month to obtain his statement concerning the allegations of his complaint.  On knowledge and belief, she called Tadesse shortly thereafter to notify him of his obligation to submit to an investigative interview relative to Mr. Routier's complaint.

---

[2] This was in error as there were only three critical elements in Plaintiff's performance plan, and this element had been identified as CE 2 in the previous year's performance plan.  For purposes of consistency, the Critical Element of Spectrum Requirements will be referred to as Critical Element 2 in the Agency Response.

52.     During Plaintiff's FY 2015 midyear review, on or about April 25, 2015, Tadesse told Plaintiff that he believed that his performance in CE 2 was deficient.  Tadesse asserted that Plaintiff was deficient in identifying and applying policy and technical guidelines from the NTIA Manual in his assessments and that Plaintiff was continuing to rely on Tadesse and other senior engineers to identify the relevant guidance to include in his assessments.  Tadesse stated that while Plaintiff had shown slight improvement in the formatting of his reports, his work product lacked consistency.   Finally, Tadesse opined to Plaintiff that Plaintiff was making an unacceptable number of errors in his work and that he needed to use the checklist Tadesse had previously provided.

53.     Tadesse also stated that he was considering placing Plaintiff on a performance improvement plan (PIP).

54.     On May 22, 2015, Tadesse executed the first of three declarations or affidavits concerning Plaintiff's EEO complaint against the Agency.

55.     In June 2015, Tadesse made it impossible for him to meet his deadline to present his report to the Spectrum Planning Subcommittee.

56.     On July 22, 2015, Tadesse came to Plaintiff's cubicle to let him know that he must tell him where he is if Plaintiff is away from his desk for more than 30 minutes.


**D.     The Performance Improvement Plan**

57.     On September 18, 2015, Tadesse placed Plaintiff on a Performance Improvement Plan.  The PIP became effective immediately and was scheduled to last for 90 calendar days.

58.     Tadesse referenced the following alleged errors in Appellant's work product in explaining why he decided to place Appellant on a Performance Improvement Plan:

On March 27, 2014, I issued you a mid-year progress review. I counseled you therein that your performance was marginal in Critical Element #2 of your FY 2014 performance plan (now Critical Element *#5* in your FY 2015 performance plan). On August 14, 2014, I issued you a Performance Counseling memorandum noticing that your performance had continued to be marginal in Critical Element #2: Spectrum Requirements. I notified you that it was imperative that you improve your performance in this Critical Element as soon as possible. I also notified you that many of your work products required extensive editing and review, leading to delays in finalizing work products and creating additional work for the branch. In the memorandum, I identified several examples of your deficient work product: (1) your preliminary assessment dated Apri1 29, 2014 (SPS-20086/1) **omitted key information** and some of the sentences therein had no periods; (2) your preliminary assessment dated May 19, 2014 (SPS-20155/l) contained irrelevant **emission designators**, numerous grammatical errors, and **mistakes in identifying frequency allocation status**; and (3) your preliminary assessment dated June 25, 2014 (SPS-20223/1) omitted relevant emission designators and **included irrelevant remarks and policy statements**. Finally, the Performance Counseling memorandum reflected our July 23, 2014 meeting in which I noted to you errors I found on your Air Force system report (SPS-20080/1), 450 MUOS. In that report, you provided an **incorrect sponsoring agency** on your draft certification and **omitted the operating location from the assessment and draft certification**, both of which are **serious errors**.

59.     Even though Hien Ly and higher-graded and more senior electronics engineers made the same errors in their work product, Tadesse never placed Ly or any of those senior electronics engineers on a PIP.

60.     The PIP required Plaintiff to complete three substantive tasks related to CE 2 including: 1) four to six preliminary assessments; 2) four draft certifications; and 3) the resolution of all edits and comments for these draft preliminary assessments or certifications. The PIP also required Plaintiff to adhere to PIP deadlines.     Tadesse alleged that Plaintiff did not successfully complete the three substantive tasks related to CE 2.

### i.     PIP Task 1: Preliminary assessments.

61.     Task 1 required Plaintiff to complete four to six preliminary assessments.[3]  A preliminary assessment report is an engineering analysis of the technical and operating

---

[3] Plaintiff completed four preliminary assessments.  The PIP contained additional requirements if Plaintiff completed five or six assessments.  However, as Plaintiff did not complete six assessments, the Agency, for brevity, has not included these requirements.

characteristics of a radio communication system submitted by federal agencies for spectrum certification.   The recommendations in each of these reports are presented at the monthly Spectrum Planning Subcommittee (SPS) meeting to provide guidance to help federal agencies and developers ensure compatibility of systems when deployed in the electromagnetic environment.

62.   The PIP specified that the preliminary assessments must have the following substantive requirements:

The document must meet the following requirements:

1. Identify and include the following information in the Introduction:
   a. Sponsoring agency;
   b. Name of the system;
   c. Purpose of the system;
   d. Spectrum Planning Subcommittee (SPS) number(s) (including the SPS number(s) of the submission);
   e. Stage of Review (i.e., 1, 2, 3, 4);
   f. Service/Station Class Symbol(s); and
   g. Operating Location(s)
2. Identify the names of the following individuals:
   a. Chairman;
   b. System Review Branch Chief; and
   c. Assessment author.
3. When applicable, provide background information on the sponsoring agency (i.e., Revised request for certification).
4. Complete a Technical & Operating Characteristics Summary Table with the following information:
   a. Frequency/band(s) (including units)
   b. Function(s) or Mode(s);
   c. Service(s);
   d. Station Class Symbol(s);
   e. Power level(s) (including units); and
   f. Emission Designator(s).
5. Include the name of the system and stage of review in the Assessment Summary Table.
6. Identify and include the following information in the allocation conformance section:
   a. Frequency band(s);

      b.  If center frequencies are requested by sponsoring agency for operations, the preliminary assessment should take into account for conformance of emission bandwidth in the allocation table for the requested service;

      c.  Conditions (including notations for primary and secondary conditions); and

      d.  Pertinent footnotes for each frequency band.

7. Identify and include the following information in the spectrum standard conformance section:

      a.  Frequency tolerance (Transmitter and Receiver) for the appropriate frequency band and service;

      b.  NTIA out-of-band emission standard compliance for each emission designator

      c.  -20 dB bandwidth calculation in accordance with Annex J of the (as applicable);

      d.  Harmonics and spurious level(s);

      e.  Receiver standard(s) (as applicable).

8. Identify and include the following information in the section addressing the Radiation Hazzard (RADHAZ):

      a.  Frequency/frequency band(s);

      b.  Antenna gain(s);

      c.  Power(s) (including units); and

      d.  Applicable criteria and determine the resulting distance.

9. Identify and describe all applicable policies (i.e. policies associated with frequency bands in Chapters 4, 8, 10) including a brief description of the policy;

10. Identify and include the following information in the section addressing the Electromagnetic Compatibility (EMC):

      a.  Describe the impact on the EMC if the result on nonconformance of frequency allocations, spectrum standards, if applicable;

      b.  Government Mater File (GMF) Statistics including frequency bands and units, if applicable, and

      c.  Proper conclusion of EMC identifying problems as applicable to the system.

11. Identify any inadequate data in the system (i.e., if you are unable to perform a formal preliminary assessment because of missing data or insufficient information) and identify the necessary course of action to prepare a data advisory memorandum using your engineering judgment; and

12. Portion mark all classified documents and include the appropriate downgrading instructions.

If for any one preliminary assessment, you, in 4 or more instances, fail to include any of the above substantive criteria (1-12), your performance will be unacceptable.

If for any one preliminary assessment, you, in 2 or more instances, provide incorrect or inaccurate information, your performance will be unacceptable.

If you complete 4 preliminary assessments and all of your preliminary assessments combined, in 13 or more instances, fail to include any of the substantive criteria (1-12), your performance will be unacceptable.

If you complete 4 preliminary assessments and all of your preliminary assessments combined, in 5 or more instances, provide incorrect information your performance will be unacceptable.

In each preliminary assessment, you must also meet the following stylistic requirements:

1. Use correct grammar and spelling;
2. Comply with all formatting guidelines (including, but not limited to, style, margins, fonts, and spacing) in the attached template as follows:
   a. Page margins – Top/Bottom: 1 inch.  Left/Right: 1.25 inches.
   b. Font – Inside Table: Heading IN Times New Roman 12 Bold, all other texts Times New Roman 10
   c. Spacing – single space

If for any one preliminary assessment, in 3 or more instances, fails to meet the above stylistic criteria (1-2), your performance will be unacceptable.

If you complete 4 preliminary assessments and all of your preliminary assessments combined, in 9 or more instances, fails to meet the above stylistic criteria (1-2), your performance will be unacceptable.

63.     During the PIP, Tadesse alleged that Plaintiff did not meet the requirements set forth for Task 1.  Plaintiff submitted four preliminary assessments, but Tadesse alleged his assessments did not meet the requisite substantive standards. Specifically, on October 21, 2015, Plaintiff submitted the preliminary assessment report for the SPS-21097/1 Air Force's EnerLinks III Digital Data Link system.   On October 30, 2015, Plaintiff submitted the preliminary assessment reports for the SPS-21108/1 Air Force GSX 70 & GWX 70 Radar, Stage 3 system. On November 24, 2015, Plaintiff submitted preliminary assessment reports for the SPS-21228/1 Air Force ULA Common Avionics EELV system.  On December 1, 2015, Plaintiff submitted a preliminary assessment report for the SPS-21183/1 Navy ESSM Block II Dual Mode Radar Seeker classified system. As Plaintiff's last assessment, the SPS-21883/1 Navy ESSM Block II

Dual Mode Radar Seeker, regarded a classified system, Tadesse did not include that report while reviewing Plaintiff's performance under the PIP.

64.     With respect to the draft preliminary assessment report, SPS-21097/1 Air Force's EnerLinksIII Digital Data Link, Tadesse opined that Plaintiff's report contained 3 alleged instances of failing to include substantive requirements, five alleged instances of including inaccurate or incorrect information, and 12 alleged instances of stylistic and formatting errors. Tadesse noted as follows:

> Substantive Requirements:
>
> > Purpose/Background/Introduction
> > 1.  Plaintiff failed to include the unit "MHz" in the frequency band 4412.5-4563.5;
> > 2.  Plaintiff failed to include the type of station on the 5-Watt transmitter;
> > 3.  Plaintiff failed to include the type of station on 10-Watt transmitter.
>
> Inaccurate or Incorrect Information:
>
> > Purpose/Background/Introduction
> > 1.  Plaintiff stated the "system is capable of operating," misstating the purpose of the system.  The system is currently operational.
> >
> > Power Level(s)
> > 2.  Under Remarks concerning the harmonic levels, Plaintiff stated that the power level for the Airborne Transmitter is 5 Watts.  The correct power level for the Airborne Transmitter is 10 Watts;
> > 3.  Under Remarks concerning the harmonic levels, Plaintiff stated that the power level for the Land Transmitter is 10 Watts.  The correct power level for the Airborne Transmitter is 10 Watts;
> > 4.  Under Remarks concerning the spurious level, Plaintiff stated that the power level for the Airborne Transmitter is 5 Watts.  The correct power level for the Airborne Transmitter is 10 Watts;
> > 5.  Under Remarks concerning the spurious levels, Plaintiff stated that the power level for the Land Transmitter is 10 Watts.  The correct power level for the Airborne Transmitter is 5 Watts;

Tadesse also alleged that Plaintiff also failed to meet the required stylistic criteria in 12 instances in this report, but that he declined to consider those failures in his determination of Plaintiff's

overall performance on the PIP.    Overall, because Plaintiff's draft included 5 instances of providing inaccurate or incorrect information, his performance was deemed unacceptable by Tadesse.

65.    With respect to the draft preliminary assessment report, SPS-21108/1 Air Force GSX 70 &GWX 70 Radar, Stage 3, Tadesse opined that Plaintiff's report included 39 instances of failing to include substantive requirements, 2 instances of incorrect or inaccurate information, and 11 instances of stylistic and formatting errors.  Tadesse noted as follows:

> <u>Substantive Requirements:</u>
>
> Allocation Conformance Section
> 1. Plaintiff failed to include the reference document number for the Notice of Proposed Rule Making (NPRM).
>
> Spectrum Standards Conformance – Technical Information
> 2. Plaintiff failed to include the average power used to determine the spurious levels cited in the section;
> 3. Plaintiff failed to include the pulse width information for the spurious levels cited in the section;
> 4. Plaintiff failed to include data regarding the level by which the harmonic levels exceeded the standard.
>
> Radiation Hazard Criteria
> 5. Plaintiff failed to include the maximum antenna gain data;
> 6. Plaintiff failed to include the average power data.
>
> Evaluation of Compliance with Unwanted Emission Standards
> 7. Plaintiff failed to include average power data for Figure 1;
> 8. Plaintiff failed to include average power data for Figure 2;
> 9. Plaintiff failed to include average power data for Figure 3;
> 10. Plaintiff failed to include average power data for Figure 4;
> 11. Plaintiff failed to include average power data for Figure 5;
> 12. Plaintiff failed to include average power data for Figure 6;
> 13. Plaintiff failed to include average power data for Figure 7;
> 14. Plaintiff failed to include average power data for Figure 8;
> 15. Plaintiff failed to include average power data for Figure 9;
> 16. Plaintiff failed to include average power data for Figure 10;
> 17. Plaintiff failed to include average power data for Figure 11;
> 18. Plaintiff failed to include average power data for Figure 12;
> 19. Plaintiff failed to include average power data for Figure 13;

20. Plaintiff failed to include average power data for Figure 14;
21. Plaintiff failed to include average power data for Figure 15;
22. Plaintiff failed to include average power data for Figure 16;
23. Plaintiff failed to include pulse with data for Figure 1;
24. Plaintiff failed to include pulse with data for Figure 2;
25. Plaintiff failed to include pulse with data for Figure 3;
26. Plaintiff failed to include pulse with data for Figure 4;
27. Plaintiff failed to include pulse with data for Figure 5;
28. Plaintiff failed to include pulse with data for Figure 6;
29. Plaintiff failed to include pulse with data for Figure 7;
30. Plaintiff failed to include pulse with data for Figure 8;
31. Plaintiff failed to include pulse with data for Figure 9;
32. Plaintiff failed to include pulse with data for Figure 10;
33. Plaintiff failed to include pulse with data for Figure 11;
34. Plaintiff failed to include pulse with data for Figure 12;
35. Plaintiff failed to include pulse with data for Figure 13;
36. Plaintiff failed to include pulse with data for Figure 14;
37. Plaintiff failed to include pulse with data for Figure 15;
38. Plaintiff failed to include pulse with data for Figure 16;
39. Plaintiff failed to include the "MHz" unit for the X-axis scale in Figure 13.

Inaccurate or Incorrect Information:

Allocations Conformance Section
1. Plaintiff included a footnote related to non-federal authorization of systems operating in the band of interest. This information was inaccurate for this federally owned system.

Pertinent Footnotes Section
2. Plaintiff included a footnote related to non-federal authorization of systems operating in the band of interest. This information was inaccurate for this federally owned system.

66.     According to Tadesse, Plaintiff also allegedly failed to meet the required stylistic criteria in 11 instances in this report, but Tadesse did not consider those failures in his determination of Plaintiff's overall performance on the PIP.   Overall, because Plaintiff's draft included 39 alleged instances of failing to include substantive criteria and two instances of allegedly providing inaccurate or incorrect information, Plaintiff's performance was deemed unacceptable.

67.     With respect to the draft preliminary assessment report, SPS-21228/1 Air Force

ULA Common Avionics EELV, Plaintiff's report contained 6 alleged instances of failing to include substantive requirements, 10 alleged instances of incorrect or inaccurate information, and 10 alleged instances of stylistic and formatting errors.  As Tadesse noted specifically:

<u>Substantive Requirements</u>:

Technical and Operating Characteristics Summary: Table 1
1. Plaintiff failed to include the frequency 2211 MHz

Allocations Conformance
2. Plaintiff failed to include the phrase "Allocation Band."

Policy
3. Plaintiff failed to include the necessary finding regarding the policy Section 8.2.41 of the NTIA manual.
4. Plaintiff failed to include policy information from Section 3.3.2 of the NTIA Manual regarding plans for coordination of the international registration requirement.

Power Flux-Density (PFD) Limits Conformance
5. Plaintiff failed to address the PFD calculation regarding the space operations.

Evaluation of Compliance with Unwanted Emissions Standards
6. Plaintiff failed to address the PFD calculation regarding the space operations.

<u>Incorrect or Inaccurate Information</u>:

Purpose/Introduction
1. Plaintiff stated "S-band" instead of the correct description "2-GHz" for the telemetry system.  Section 6.2 of the NTIA manual states that letters should not be used to designate a frequency band.

Allocations Conformance
2. Plaintiff stated that the 420-450 MHz band is used for "the purpose for transmitting vehicle telemetry, tracking and video data to ground stations." This was inaccurate.

Spectrum Standards Conformance
3. Plaintiff combined the information regarding the launch vehicle transmitter and the space transmitter.  This was inaccurate because the information should be identified separately.

Power Flux-Density (PFD) Limits Conformance
4.  Plaintiff made a calculation error regarding the PFD limits for the Launch vehicle.

Electromagnetic Compatibility (EMC)
5.  Plaintiff made an incorrect statement concerning "enforcing a justification on using bandwidth exceeding 5 MHz for space system transmission, which should be addressed in the policy section.  Section 8.2.41 of the NTIA Manual states that "For transmission that require necessary bandwidths of greater than 5 MHz, the requesting agency shall submit justification on why a bandwidth exceeding 5 MHz is necessary; furthermore, agencies are to explain why the radio communications requirement cannot be satisfied through use of transmissions using less bandwidth i.e., 5 MHz of less, e.g., through use of more spectrally efficient modulation.

Evaluation of Compliance with Unwanted Emissions Standards
6.  The graph in Figure 1 contains the wrong system name.  Figure 1 labels the system as "MRSB00 Radar Transmitter."  The preliminary assessment evaluates the ULA Common Avionics EELV system.
7.  The graph in Figure 2 contains the wrong system name.  Figure 2 labels the system as "MRSB00 Radar Transmitter."  The preliminary assessment evaluates the ULA Common Avionics EELV system.
8.  The graph in Figure 3 contains the wrong system name.  Figure 3 labels the system as "MRSB00 Radar Transmitter."  The preliminary assessment evaluates the ULA Common Avionics EELV system.
9.  The graph in Figure 4 contains the wrong system name.  Figure 4 labels the system as "MRSB00 Radar Transmitter."  The preliminary assessment evaluates the ULA Common Avionics EELV system.
10. The PFD plot in Figure 5 for the 2-GHz signal is incorrect.

68.     Tadesse alleged that Plaintiff also failed to meet the required stylistic criteria in 10 instances in this report, but Tadesse did not consider those failures in his determination of Plaintiff's overall performance.    In sum, because Plaintiff's draft included what Tadesse alleged were six instances of failing to include substantive criteria and ten instances of providing inaccurate or incorrect information, Tadesse deemed his performance unacceptable.

69.     On December 10, 2015, when Plaintiff presented this report to SPS, SPS determined that the draft failed to identify and analyze a necessary frequency, 2255.5 MHz. The Air Force reviewed Plaintiff's report and, in response, reached out to SPS, attaching a

document demonstrating that it had provided this missing frequency data in its original request for certification.    Plaintiff thus had this information but failed to include it in his assessment. On April 14, 2015, Plaintiff presented a revised preliminary assessment and certification addressing the missing frequency.

70.      Per the PIP, Plaintiff was required to complete at least four preliminary assessments.  The last and fourth assessment, SPS-211831/1 Navy ESSM Block II Dual Mode Radar Seeker, was on a classified system.  As a result, Tadesse did not consider that system in evaluating Plaintiff's overall performance on the PIP (and thus did not include the errors therein in determining whether Plaintiff's number of errors exceeded the number allowed under the PIP for all four assessments).    The PIP provided that if Plaintiff completed 4 preliminary assessments and had 13 or more instances of failing to include substantive criteria or 5 or more instances of providing incorrect information, his performance would be unacceptable.    Despite Tadesse considering only three preliminary assessments in his review of Plaintiff's performance, Tadesse determined that Plaintiff had 48 instances of failing to include substantive criteria and 17 instances of incorrect information    As a result, Plaintiff's performance under Task 1, Preliminary Assessments, was deemed unacceptable by Tadesse.

### ii.      PIP Task 2: Draft Certification Form NTIA-44

71.      Task 2 required Plaintiff to complete four draft certifications.  A draft certification is an NTIA form that includes: the operating characteristics of a telecommunications system, recommendations on technical adjustments that can be made to mitigate potential electromagnetic interference problems, and operating constraints (if applicable).

72.      The PIP specified that the draft certifications must have the following substantive requirements:

1. Identify the sponsoring agency.
2. Identify the name of the system.
3. Identity the stage of review.
4. Identify and include the following information regarding operating characteristics in Section 1:
   a. Frequency (including units);
   b. Emissions Designators (ensuring they match the Technical & Operating Characteristics Summary Table in the preliminary assessment);
   c. Mean Power (including units);
   d. Station Class Symbols; and
   e. Operating Locations.
5. Identify and include the following information regarding source documents in Section 2:
   a. SPS number(s) (ensuring that it/they match the SPS number(s) in the preliminary assessment);
   b. Date of submission; and
   c. Drafting agency.
6. Identify and include the following information regarding the recommendations of the Spectrum Planning Subcommittee in Section 3:
   a. Name of the System;
   b. Stage of spectrum support for the system;
   c. Sponsoring agency;
   d. Name and title of recommending official; and
   e. Complete report of subcommittee's recommendations to sponsoring agency.
7. Identify and include the following information regarding NTIA Certification in Section 4:
   a. Stage of spectrum support for the system; and
   b. Name and title of certifying official.
8. Portion mark all classified assessments and include downgrading instructions.

If for any one draft certification, you, in 3 or more instances, fail to include any of the above substantive criteria (1-8); your performance will be unacceptable.

If for any one draft certification, you, in 3 or more instances, provide incorrect information; your performance will be unacceptable.

If you complete 4 draft certifications and all of your draft certifications combined, in 9 or more instances, provide incorrect information, your performance will be unacceptable.[4]

In each draft certification, you must meet the following stylistic requirements:
1. Use correct grammar and spelling;
2. Comply with all formatting guidelines (including, but not limited to, file naming, abbreviations, lists, margins, fonts, and spacing) set forth in the attached "Spectrum Certification Conventions" handbook issued on September 11, 2015 (attached), as

---

[4] The PIP contained additional requirements if Plaintiff completed more than four draft certifications.

follows:

    a.   Section 1 – Do's and Don'ts
    b.   Section 2 – Form NTIA-44
    c.   Section 3 – Abbreviations
    d.   Section 4 – Align Versions in Draft Revisions to Existing Certifications
    e.   Section 5 – Lists
    f.   Section 6 – File Naming and Network Drive Associated Folders

If for any one draft certification, you, in 3 or more instances, fail to meet the above stylistic criteria (1-2), your performance will be unacceptable.[5]

73.    During the PIP, Tadesse opined that Plaintiff did not meet the requirements set forth for Task 2.  Plaintiff submitted four draft certifications, but according to Tadesse, one of his submissions exceeded the number of errors allowed for one draft assessment.  Specifically, on October 21, 2015, Plaintiff submitted a draft certification for the SPS-21097/1 Air Force's EnerLinks III Digital Data Link system.  On October 30, 2015, Plaintiff submitted a draft certification for the SPS-21108/1 Air Force GSX 70 & GWX Radar, Stage 3 system.  On November 24, 2015, Plaintiff submitted a draft certification for the SPS-21228/1 Air Force ULA Common Avionics EELV system.  On December 1, 2015, Plaintiff submitted the draft certification for the SPS-21183/1 Navy ESSM Block II Dual Mode Radar Seeker classified system.  Tadesse did not include this draft in considering Plaintiff's performance under the PIP (for the reasons previously stated).

74.    With respect to the draft certification, SPS-21097/1 Air Force's EnerLinksIII Digital Data Link, Tadesse opined that Plaintiff's certification contained one instance of incorrect or inaccurate information.  In draft certification, SPS-211081/1 Air Force GSX 70 & GWX 70 Radar, Stage 3, Tadesse determined that Plaintiff's certification contained one instance of incorrect or inaccurate information.  SPS-21108/1 failed to meet the required stylistic criteria in four instances, but Tadesse did not include these errors in considering

---

[5] The PIP contained additional requirements if Plaintiff completed more than four draft certifications.

whether Plaintiff's performance was acceptable under the PIP.

75.     Plaintiff submitted draft certification, SPS-21228/1 Air Force ULA Common Avionics EELV, on November 24, 2015.  According to Tadesse, this draft certification contained six instances of failing to include substantive requirements and one instance of inaccurate or incorrect information as follows:

Substantive Requirements:

Section 1 Operation Characteristics
1.  Plaintiff failed to include the 2211 MHz frequency;
2.  Plaintiff failed to include the location, Littoral Areas, Pacific;
3.  Plaintiff failed to include the location, Littoral Areas, Atlantic.

Section 3 SPS Recommendations
4.  Plaintiff failed to include the emissions designators;
5.  Plaintiff failed to include the PFD waiver information, including the level exceeding the PFD, in recommendation number 5;
6.  Plaintiff failed to include the SPS document number allowing for a waiver in recommendation number 5.

According to Tadesse, Plaintiff's draft also contained five alleged instances of failing to meet the required stylistic criteria, but Tadesse claimed he did not include that information in his evaluation of Plaintiff's performance under the PIP.  As this draft allegedly contained six alleged instances of failing to include substantive requirements, Tadesse deemed Plaintiff's performance unacceptable.

76.     During the PIP, Tadesse opined that Plaintiff did not meet the requirements set forth for Task 2.  Per the PIP, Plaintiff was required to complete at least four draft certifications. The last and fourth certification, SPS-211831/1 Navy ESSM Block II Dual Mode Radar Seeker, was on a classified system.    As a result, Tadesse claimed he did not consider that systems and the alleged errors in it in evaluating Plaintiff's overall performance on the PIP.  The PIP provided that if Plaintiff completed 4 draft certifications and had 9 or more instances of failing to include

substantive criteria or 9 or more instances of providing incorrect information, his performance would be unacceptable.  Here, Tadesse alleged that Plaintiff did not reach the overall limit for the instances of failure in all four draft certifications.  However, because SPS -21228/1 Air Force ULA Common Avionics EELV draft certification contained six instances of failing to include the required substantive criteria, (the limit was 3 or more instances per draft certification), Plaintiff's performance was deemed unacceptable by Tadesse in Task 2.

       **iii.**       **PIP Task 3: Editing of Preliminary Assessments and Draft Certifications**

77.     Task 3 required Plaintiff to resolve any comments and/or edits by Tadesse on his preliminary assessments and draft certifications and resubmit the preliminary assessment or draft certification within six business hours of Tadesse's email providing the comments and edits.  If the circumstances called for it, Tadesse would allow Plaintiff additional time to resolve his comments.   Additionally, if the re-draft required additional information or clarification, Tadesse would send his comments to Plaintiff a second time. The PIP further provided that if Plaintiff, "for any one re-draft, in 3 or more instances, fail[s] to fully resolve [Tadesse's] comments, [Plaintiff's] performance will be unacceptable," and "for any one preliminary assessment or draft certification, fails to fully resolve more than 1 of [Tadesse's] comments over the course of two re-drafts, [Plaintiff's] performance will be unacceptable."

78.     With respect to preliminary assessment, SPS-21108/1 Air Force GSX 70 & GWX 70 Radar, Stage 3, Plaintiff submitted re-drafts on November 3, 2015.  Plaintiff's first and second re-drafts each failed to fully resolve Tadesse's comments.  As Tadesse noted:

First Re-draft:

Allocation Conformance Section
1.  Plaintiff failed to include the reference document for the NPRM, despite Tadesse's instructions to do so in the comments in the comments provided in the initial draft.

Evaluation of Compliance with Unwanted Emissions Standards
2.   Plaintiff failed to include the "MHz" unit for the X-axis scale related to Figure 13, despite Tadesse's instructions to do so in the comments provided in the initial draft.

Second Re-Draft:

Allocations Conformance Section
1.   Plaintiff failed to address Tadesse's comments regarding the reference document number for the NPRM.  Plaintiff provided an incorrect reference number and Tadesse had to identify the correct reference number and revise the report accordingly.
Evaluation of Compliance with Unwanted Emission Standard
2.   Plaintiff failed to include the "MHz" unit for the X-axis scale related to Figure 13, despite Tadesse's instruction to do so in the comments provided in both the initial draft and the first re-draft.

As Tadesse opined that Plaintiff failed in two instances to fully resolve Tadesse's comments through the course of two drafts, his performance was deemed unacceptable in Task 3.

79.     While the SPS-21108/1 preliminary certification was the only draft in which Plaintiff allegedly failed to fully resolve Tadesse's comments over the course of two drafts, Tadesse noted that many of Plaintiff's preliminary assessments and draft certifications required two re-drafts to fully resolve Plaintiff's errors and many of the re-drafts contained different errors than the first draft.

**E.     Performance Errors by Hien Ly in 2015**

80.     Tadesse has testified under oath that Plaintiff's errors were unacceptable and justified his placement on a PIP, but that Ly's similar or even identical errors were acceptable or "minor."

81.     Numerous preliminary reports authored by Hien Ly in 2015 displayed four or more instances of failure to include substantive criteria 1-12, two or more instance of incorrect or inaccurate information, and three or more instances of failure to meet the stated stylistic criteria, and several of his NTIA-44 draft certifications of spectrum support displayed three or

more instances of incorrect information, failure to include substantive criteria 1-8, and three of more instances of failure to meet the stylistic criteria:

82.     In Preliminary Assessment No. SPS-21107/1, dated October 22, 2015, Ly committed four substantive errors or instances of incorrect information: Ly began referring to satellite system by acronym "InSight" before referring to it by its full name "Interior Exploration Using Seismic Investigations, Geodesy, and Heat Transport," under "Remarks" column of "Allocation Conformance" section, Ly failed to indicate that 401-402 MHz is not allocated for the space research service before stating that NASA can conduct Space Research in non-allocated bands per sec. 8.2.40 of the NTIA Manual, Ly failed to state that no allocation supports space research service under 420-450 MHz band, in "Spectrum Standard Conformance" section of table under "Findings" column wrote incorrection emission designator, and Ly also wrote "Does not conform" instead of "Does not apply."

83.     In Preliminary Assessment No. SPS-20235/2, dated November 19, 2015, Ly demonstrated three instances of incorrect information errors and one stylistic error: he incorrectly wrote "$470 thousands" instead of "$470,000," wrote "MHz" after 5000-5250 although the column heading already specified "MHz," omitted policy "Sections 1.4.2 and 9.14.1 of the NTIA Manual specifies use of the band 5000-5250 MHz in aeronautical radionavigation service that needs to coordinate," and violated the "Dos and Don'ts by referring to the "Aeronautical Advisory Group" as the "Aeronautical Assignment Group."

84.     In Certificate of Spectrum Support Nos. SPS-20411/3 and SPS-20777/2, Ly displayed five instances of incorrect information.

85.     In Preliminary Assessment No. SPS-21047/1, dated November 5, 2015, Ly committed two incorrect information errors and one substantive policy error. Ly wrote 30000-

31000 MHz instead of 30-31 GHz, Ly wrote 20200-21200 MHz instead of 20.2-21.2 GHz, and Ly included incorrect policy (sec. 8.2.43 of the NTIA Manual).  Under oath, Tadesse absolved Ly of this error, responding, "This is a policy supposed to be for non-transportable station but the system was not transportable.  That's why that policy didn't apply.")

86.     In Preliminary Assessment No. SPS-21115/1 dated November 23, 2015, Ly committed four stylistic errors, four substantive errors, and four instances of incorrect information: Tadesse had to change "enables" to "provides" (substantive error 1.c.) and to remove "United States" from "Army Corps of Engineers" as it was redundant. Ly also misstated the cost as "$ 75 thousand per unit" instead of simply "$75,000," Ly omitted "or -115 dBw" (substantive 4.a, "Frequency Band" section of table), Ly wrote "more than" instead of "greater than," omitted "-115 dBw, (substantive error 7), Ly omitted "fixed" from the phrase "fixed stations" and did not specifically include "7125-8500 MHz" even though the entire fixed band comprises 1710 MHz -15.35 GHz, thereby exceeding the range 7125-8000 MHz.  Ly erroneously wrote the wrong policy in endnote 3 (Ly wrote NTIA Manual "subsection 5.3.3.B.2" instead of "Section 5.3.3"), Ly erroneously wrote "The -60 dB Receiver bandwidth shall not exceed five times the -3 dB receiver bandwidth," and Ly redundantly and incorrectly referred to "2 degrees° and omitted "Required by 2 degrees. Minimum separation angle is 2 degrees."

87.     In Certificate of Spectrum Support No. SPS-21224/1 and SPS-xxx, DOC 392-393, Ly committed two stylistic errors, two instances of incorrect information, and three substantive errors: Ly misspelled operating locations "Miliaty" instead of "Military," Ly wrote the acronym "Ra"[6] instead of "Range," Ly listed the incorrect date ("January 21, 2016" instead of "September 23, 2015"), Ly wrote "aircraft" instead of writing "aircraft stations," Tadesse had

_____

[6] Mr. Tadesse confirmed at the Merit Systems Protection Board hearing in September 2017 that "Ra" is an acronym for "Range."

to include "we need another [recommendation] stating 5.1.2 for the second harmonic level exceeding by 13 dB" because Ly did not, Ly listed the incorrect system (substantive error # 2), by writing "Common Range Integrated System" instead of "WR-RAD-14 Datalink," and Ly omitted the "QA from the convention" in Section 4.

88.     In Preliminary Assessment No. SPS-21227/1, Ly demonstrated four instances of incorrect information and/or substantive errors: Ly referenced "Ka-Band Objects Observation and Monitoring" again after having already introduced its acronym "KaBOOM," Ly described the "frequency band" as just "band,"  Tadesse had to delete Ly's "did not provided frequency tolerance of both transmitter and receiver, the transmitter's harmonic emission level, and" from the Data Adequacy section under the "Remarks" column, and Ly omitted from the National Allocations Conformance section under "Remarks" that "Footnote G117 states that the Government fixed-satellite services are limited to military systems," and Ly referred to military systems as merely "stations."


**F.     Guidance and Feedback Provided to Plaintiff during the PIP Period**

89.     During the PIP period, Tadesse made himself available weekly to meet with Plaintiff to provide him guidance and feedback and to allow him a scheduled opportunity to ask questions.

90.     In the PIP, Tadesse provided a mechanism by which Plaintiff could request extensions of PIP deadlines.

91.     Tadesse also authorized Plaintiff to spend an hour each week reading the Manual of Regulations and Procedures for Federal Radio Frequency Management and encouraged Plaintiff to bring any questions he had about these materials to Tadesse at the

scheduled weekly meetings.

92.     In the PIP, Tadesse notified Plaintiff additionally that, if Plaintiff believed he needed training that would assist him in improving his performance, he should bring it to his attention at their initial meeting.  Plaintiff did not request any training at such meeting.

93.     Tadesse never told Plaintiff during the PIP, verbally or in writing, that he was in danger of failing the PIP.


**G.     End of the PIP**

94.     The PIP period ended in December 2016.

95.     Tadesse did not tell the Plaintiff in December 2016 that he had failed the PIP.

96.     For several months, Plaintiff continued working as an Electronics Engineer.


**H.     Proposal, Replies, and Decision to Remove**

97.     In late July 2016, the agency received an Acknowledgment Order dated July 18, 2016 concerning Plaintiff's EEOC Complaint No. 570-2016-00372X.

98.     Two weeks later, on August 4, 2016, Tadesse issued Plaintiff a Notice of Proposed Removal (Proposal).   Therein, Tadesse detailed what he alleged were Plaintiff's performance deficiencies under the PIP and explained the decision to propose his removal.   The Proposal advised Plaintiff of his right to review the materials relied upon in issuing the Proposal and his right to reply to Darlene A. Drazenovich, the deciding official.

99.     On September 2, 2016, Plaintiff provided Ms. Drazenovich a written reply (Written Reply).  Therein, Plaintiff referenced his 27 years of federal service, including 10 years with the Agency, and argued that his removal was not supported by substantial evidence.

Specifically, Plaintiff argued that his performance standards were improperly measured as all his preliminary assessments were approved by SPS and that the Agency's failure to provide Plaintiff with a performance evaluation post-PIP prior to issuance of the Proposal to Remove meant that Plaintiff did not have a reasonable time to improve his performance.    Plaintiff also argued that the proposal to remove was issued in retaliation for his initiation of a complaint of discrimination in September of 2014.    Finally, Plaintiff argued that the Agency failed to properly consider the *Douglas* factors in deciding to propose Plaintiff's removal.    Plaintiff did not dispute the specific failures cited in the Proposal to Remove.

100.    On September 27, 2016, Plaintiff presented an oral reply (Oral Reply).  In the Oral Reply, Plaintiff argued that he completed all his assignments under the PIP; they were approved by the subcommittee that he presented his work to; and he believed that he had completed the PIP successfully in December of 2015.    Plaintiff also argued that the proposed removal and the PIP were in reprisal for his EEO activity.    Finally, Plaintiff argued that the *Douglas* factors supported mitigating the removal.    Again, Plaintiff did not dispute the specific cited failures in the Proposal.

101.    Following her review of the Proposal, the supporting documentation, Plaintiff's Written Reply and Oral Reply and all documentation Plaintiff submitted in response to the Proposal, Ms. Drazenovich stated that Plaintiff's performance during the PIP period did not rise to the required level of Minimally Meets Expectations, Level 2.

102.    On September 26, 2016, the Agency received notice from the Roni Ralston that she had withdrawn as counsel for Mr. Routier.

103.    Consequently, on September 27, 2016, Ms. Drazenovich issued a decision to remove (Decision to Remove) Plaintiff from his position and from the Federal service effective

on the same day.

104. In her Decision to Remove, Ms. Drazenovich considered and addressed the items Plaintiff raised in his replies to the Proposal. For example, Ms. Drazenovich considered Plaintiff's criticism of the PIP and his defense of his work and opined that the criticisms and defense did not have merit. Specifically, she stated:

> I find that your criticism of the PIP at your oral reply and in your written reply are not supported. The PIP provided very clear, step-by-step instructions for you and its requirements were reasonable and related directly to your duties as an Electronics Engineer. I find that your comments defending your work under the PIP are similarly unsupported. Your work before and during the PIP contained numerous errors beyond simple grammatical errors and at your grade level you are responsible for serving as a highly knowledgeable subject matter specialist working at a nearly independent level of supervision. You had a 90-day improvement period to demonstrate acceptable performance and failed to do so. The majority of work contained some level of errors, and several drafts were riddled with errors. These drafts were moved through several rounds of edits and eventually had to be corrected by Tadesse so they could be reviewed and approved by the Committee and senior management. Because final approval of your prepared documents by the Committee and senior management came only after Tadesse actively corrected them, having achieved final approval does not constitute acceptable performance during the PIP. Moreover, the PIP did not set any unreasonable standard for errors, but took into consideration normal human error. The majority of the stylistic errors you made were not used in determining your overall failure of the PIP. Thus, I do not find that the general comments you provided in your oral and written replies change my assessment that the PIP was clear and reasonable and that your performance did not meet the required standard during the PIP period.

105. Ms. Drazenovich also noted NTIA's mission and the criticality of staff completing their tasks in a technically competent manner, stating:

> In carrying out its spectrum certification mission, NTIA manages various types of risk – scheduling, budgetary, and mission/performance. NTIA manages these risks to the federal agencies by providing timely, technically sound decisions regarding agency requests on certification of spectrum support for their systems. In performing spectrum certification work, NTIA depends on its engineering staff to assess conformity to allocations, radio frequency spectrum standards, and applicable spectrum management policies and identify potential electromagnetic compatibility problem areas. NTIA relies on this staff to propose courses of action to resolve potential interference problems. The NTIA staff must perform these tasks in a timely and technically competent manner in order for NTIA to manage risks associated with acquisition/planning, deployment/operations, resource allocation and utilization, and interference mitigation.

When an employee is not able to meet performance standards, as described above, this results in delays in agencies' acquisition processes, potential increase contact and program costs and delays in fielding needed, state-of-the art systems to unit in the field.

106.    Ms. Drazenovich also cited to Plaintiff's preliminary assessment report for SPS-21228/1 Air Force ULA Common Avionics EELV and alleged that his errors in preparing that report, failing to address the 2255.5 MHz frequency in his preliminary assessment, compromised the Air Force's ability to accomplish its mission and in addition to creating more work for NTIA, caused significant embarrassment for NTIA.

107.    Finally, in her Decision to Remove, Ms. Drazenovich found that removal would have been warranted for Plaintiff's failure of any one of the PIP tasks set forth for acceptable performance of the CE.

## COUNT I – DISCRIMINATION (DISPARATE TREATMENT) OFFENSIVE OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964 (RACE, NATIONAL ORIGIN, REPRISAL) AND AGE DISCRIMINATION IN EMPLOYMENT ACT OF 1967 (AGE)

108.    All preceding paragraphs are incorporated by reference.

109.    Tadesse made disparaging comments to Plaintiff based on his national origin.

110.    Tadesse made disparaging comments about Plaintiff and the other engineers in his group under the age of 40.

111.    Mr. Ly and Mr. Routier were both GS-085-13 engineers from 2014 to 2016.

112.    In Fiscal Year (FY) 2012 and FY 2013, Binyam Tadesse gave Plaintiff an overall performance rating of "3."  Prior supervisors rated Plaintiff as a "4."

113.    Hien Q. Ly is an Asian, Vietnamese-American under the age of 40.

114.    In FY 2013, Tadesse gave Hien Ly, then a GS-0855-12 Electronics Engineer, a rating of "5" in the critical area of Customer Service, and a "4" in the critical area of Spectrum Requirements.

115.     Even though they made some of the same substantive errors or included the same kind of incorrect information in their work, Tadesse rated Plaintiff as a "2" for FY 2014 and rated Ly as a "5" for FY 2014.

116.     In 2015, after Mr. Routier initiated EEO contact and filed a formal EEO complaint, the Agency placed Mr. Routier on a performance improvement plan for allegedly making mistakes in his assessments and draft certifications, including but not limited to omitting key information, including irrelevant emission designators, making mistakes in identifying frequency allocation status, including irrelevant remarks and policy statements, providing incorrect sponsoring agencies, and omitting operating locations

117.     Mr. Ly's assessments and draft certifications also reflect mistakes in his assessments and draft certifications, including but not limited to omitting key information, including irrelevant emission designators, making mistakes in identifying frequency allocation status, including irrelevant remarks and policy statements, providing incorrect sponsoring agencies, and omitting operating locations.

118.     The Agency never placed Mr. Ly on a performance improvement plan.

119.     The Agency never suggested disciplining Mr. Ly for making errors in his work product similar to those allegedly made by Mr. Routier.

120.     Tadesse later stated under oath that Mr. Routier's errors were inexcusable but that Mr. Ly's errors were acceptable.

121.     Plaintiff's PIP ended in December 2016.

122.     Months passed without Plaintiff being notified that he had not passed the PIP.

123.     The Agency received an EEOC acknowledgment order dated July 18, 2016 concerning Plaintiff's EEOC Complaint No. 570-2016-00372X.

124.    Two weeks later, on August 4, 2016, the Commerce Department issued Plaintiff a notice of proposed removal.

125.    Plaintiff's attorney, Alan Lescht & Associates, notified the Commence Department on September 26, 2016 that it was withdrawing its representation of the Plaintiff.

126.    The following day, September 27, 2016, the Commerce Department removed the Plaintiff from federal service.

127.    When Plaintiff contacted the Agency about applying for retirement, Agency H.R. official Richard Costello told Plaintiff that he would have to withdraw his ongoing EEOC complaint before the Agency could process his retirement application.

128.    Tadesse acknowledged under oath that reasons other than Mr. Routier's performance prompted Mr. Routier's placement on a PIP, receipt of a notice of proposed removal, and ultimate removal from Federal service.

129.    The plaintiff's removal, given his record of high performance and no misconduct, was an overly harsh punishment.

130.    The Agency discriminated and retaliated against the Plaintiff in violation of the Civil Rights Act of 1964 and the Age Discrimination in Employment Act.  The Plaintiff has been damaged thereby through economic loss, lost promotional and bonus opportunities, with attendant loss of pay and other benefits associated with promotions, bonuses and awards for exceptional performance, damage in the form of emotional distress and feelings of helplessness, which adversely affected his enjoyment of life, and ultimately, led to the termination of his Federal career, and additionally, personal and professional humiliation.

**COUNT II – HOSTILE WORK ENVIRONMENT OFFENSIVE OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964 (RACE, NATIONAL ORIGIN, REPRISAL) AND AGE DISCRIMINATION IN EMPLOYMENT ACT OF 1967 (AGE)**

131.     All preceding paragraphs are incorporated by reference.

132.     In Fiscal Year (FY) 2012 and FY 2013, Binyam Tadesse, Chief, Systems Review Branch, rated him as a "3" even though prior supervisors had rated his performance as an overall "4."

133.     Tadesse has subjected him to unwelcome and intimidating comments regarding his performance, including but not limited to:

a.     In July 2013, Tadesse told Plaintiff that he was frustrated with reviewing Plaintiff's work because of the amount of time it takes.

b.     In December 2013, Tadesse met with Plaintiff to discuss yearly performance. During that time, Tadesse told him that he was not ready to get promoted to the GS-14 level and claimed that his work performance was not good enough.

c.     On July 23, 2014, Tadesse came to Plaintiff's cubicle and told him that he was tired of seeing him making errors in his preliminary assessment. Tadesse then invited him into his office and then showed him a typographical error from April 2014, and error which he notes he corrected soon after an April 2014 meeting. During the July 23, 2014 meeting, Tadesse told him that he planned on his using the "performance counseling" and to fire him. Tadesse commented that he would "let [Plaintiff] go" as an employee.

134.   On August 14, 2014, Tadesse issued him a "Performance Counseling" memorandum notifying him that his performance was "of concern."

135.    On October 2, 2014, Tadesse "harshly and loudly inquired" about his whereabouts when he left the office to attend the Department's National Disability Awareness Month program.

136.    On October 4, 2014, he received his FY 2014 performance evaluation, which rated his performance as "Level 2 or Marginal" under the "Spectrum Requirements and Customer Service."

137.    Tadesse deliberately excluded Plaintiff's name from the Systems Review Branch Group Gold Medal Award presented in January 2015.

138.    On April 24, 2015, Tadesse met with him to talk about his mid-year review. During the meeting, Tadesse claimed that his performance is not at the level to rate him "at least satisfactory" and spoke about placing him on a performance improvement plan.

139.    In June 2015, Tadesse made it impossible for him to meet his deadline to present his report to the Spectrum Planning Subcommittee.

140.    On July 22, 2015, Tadesse came to Plaintiff's cubicle to let him know that he must tell him where he is if he is away from his desk for more than 30 minutes.

141.    On September 18, 2015, Plaintiff was placed on a Performance Improvement Plan.

142.    On August 4, 2016, the Commerce Department issued Plaintiff a notice of proposed removal.

143.    On September 27, 2016, the Commerce Department removed the Plaintiff from federal service.

144.    The Agency's above-described harassment constituted a hostile work environment in violation of the Civil Rights Act of 1964 and the Age Discrimination in

Employment Act.   The Agency's severe and pervasive misconduct was objectively and subjectively abusive, degrading and humiliated the Plaintiff.   These actions have subjected Plaintiff to personal and professional humiliation, emotional distress, and feelings of helplessness that adversely affected his enjoyment of life.

## <u>REQUEST FOR RELIEF</u>

**WHEREFORE**, the premises considered, Plaintiff respectfully prays that this Honorable Court:

1.      Enter judgment on Plaintiff Routier's behalf against the Defendant;

2.      Award Plaintiff Routier compensatory damages of approximately $50,000, arising from the Agency's violations of the Americans with Disabilities Act, Rehabilitation Act, Title VII of the Civil Rights Act of 1964 and all other statutes described above.

3.      Award Plaintiff Routier his court costs, expenses, attorney's fees, prejudgment interest and post-judgment interest;

4.      Reinstate Plaintiff Routier in his position of GS-0855-13 Electronics Engineer at his previous grade and pay, with back pay and interest due;

5.      Grant other relief as this court deems just and proper.

Respectfully submitted,

**SOLOMON LAW FIRM PLLC**

By: /s/ Gerald Gilliard
        Gerald L. Gilliard, Esq.
        D.C. Bar. No. 497726
        1025 Connecticut Avenue N.W., Suite 1000
        Washington, D.C. 20036
        Tel. (202) 857-9712
        Fax (202) 688-1896
        E-Mail: ggilliard@fedemploylaw.com